**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| SAM L. BOOKER, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | No. 2:14-cv-02604-JPM-dkv |
| SYNGENTA CROP PROTECTION, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Before the Court is Defendant's Motion for Summary
Judgment, filed July 22, 2015. (ECF No. 28.) For the following
reasons, the Motion is GRANTED IN PART as to the constructive
discharge, front pay, back pay, and punitive damages claims and
DENIED IN PART as to the failure to promote claims.

**I.   BACKGROUND**

**A.   Factual Background**

The following is a summary of the undisputed facts relevant
to this Order. Sam Booker began his employment with Novartis in
March 1997 as a Marketing Specialist. (Booker Dep. 102:8-103:6,
ECF No. 28-5; Statement of Undisputed Facts ("SUF") ¶ 3, ECF No.
28-2; Pl's Resp. to Statement of Undisputed Facts ("Resp. to
SUF") ¶ 3, ECF No. 31-1.) On January 1, 2001, after Syngenta
was formed by the merger of Novartis and AstraZeneca, Booker's

job title changed to Sales Representative in the Mid-South District of the Southern Commercial Unit ("CU"). (Booker Dep. 104:3-7; SUF ¶ 4; Resp. to SUF ¶ 4.) In the role of Sales Representative, Plaintiff did not have formal managerial responsibilities, but managed interns and Developmental Sales Representatives ("DSR"). (Booker Dep. 106:22-107:9; Booker Decl. ¶ 29, ECF No. 31-3; SUF ¶ 5; Resp. to SUF ¶ 5.)

On July 1, 2011, after Syngenta integrated its crop protection and seed businesses, Booker moved into the newly created role of Retail Business Representative ("RBR"). (Booker Dep. 105:4-24; Booker Dep. Ex. 14, ECF No. 28-5 at PageID 206; SUF ¶ 6; Resp. to SUF ¶ 6.) In that position, Booker assisted District Manager Bruce Zurface with the day-to-day operations of the Mid-South District. (Booker Dep. 51:14-18; SUF ¶ 6; Resp. to SUF ¶ 6.) Booker alleges that he also was "responsible for managing the business programs of customers (Zurface Dep., pp 36-37), managing the seed portfolio (Booker Dep. p. 51), being 'in charge of crop production allocations, the seed allocations, the seed budgets...the forecasting and things like that for the entire district.' (Id.)" (Resp. to SUF ¶ 6.)

### 1. Regional Account Lead ("RAL") Position

On July 31, 2013, Syngenta internally posted an opening for a Regional Account Lead ("RAL") position. (Booker Dep. 111:19-112:8; SUF ¶ 7; Resp. to SUF ¶ 7.) This particular RAL position

serviced the customer Crop Production Services ("CPS").
(Colburn Dep. 8:3-12, ECF No. 28-6; Booker Dep. 113:8-10; SUF
¶ 8; Resp. to SUF ¶ 8.)  CPS is headquartered in Tampa, but its
Southern Region stretches from Florida to New Mexico, so most
meetings between CPS and Syngenta's RAL were to take place in
Memphis.  (Campbell Dep. 8:17-9:5, ECF No. 28-7; SUF ¶ 8; Resp.
to SUF ¶ 8.)  On August 9, 2013, Booker spoke with Jon Colburn,
the hiring manager for the RAL position, who encouraged Booker
to apply for the position.  (Booker Dep. 130:25-132:3; SUF ¶¶ 9-
10; Resp. to SUF ¶¶ 9-10.)  Booker also felt that Michael Boden,
Head of the Southern CU, encouraged him to apply for the RAL
position.  (Booker Dep. 130:21-24, 134:9-11; SUF ¶ 11; Resp. to
SUF ¶ 11.)

During the internal interview process, Syngenta interviewed
Booker and Tommy Killebrew for the RAL position. (Colburn Dep.
21:17-24; Campbell Dep. 11:9-10; SUF ¶ 12; Resp. to SUF ¶ 12.)
Syngenta ultimately offered the position to Killebrew on or
around September 18, 2013.  (ECF No. 31-14; SUF ¶ 14; Resp. to
SUF ¶ 14.)  When Booker was advised that he was not selected for
the position, Colburn informed Booker that they were looking for
something with "district manager" or "district manager-like
experience."  (Booker Decl. ¶ 14; Colburn Dep. 43:7-21; Resp. to
SUF ¶ 14.) Over the course of litigation, Syngenta has
continuously asserted that Killebrew was selected because he was

3

"the better candidate in light of his experience with CPS, the support expressed by key members of CPS' management team, and his overall diverse business experience in the seed business." (SUF ¶ 14; Resp. to SUF ¶ 14; <u>see also</u> Campbell Dep. 17:14-18:12, 20:1-21:1; Colburn Dep. 23:9-25:16; White Dep. 68:20-69:15.)  Defendants have also asserted that Killebrew had wide geographic experience, while Booker's experience was limited to a single geographic area.  (SUF ¶ 15; <u>see also</u> Campbell Dep. 20:1-19.)

Booker was informed that he was not selected for the RAL position on October 4, 2013.  (Booker Dep. Ex. 10, ECF No. 28-5 at PageID 197; Colburn Dep. 42:13-43:6; SUF ¶ 16; Resp. to SUF ¶ 16.)  Mr. Killebrew declined the position for personal reasons.  (Campbell Dep. 19:1-4; Colburn Dep. 26:20-27:4; SUF ¶ 17; Resp. to SUF ¶ 17.)  Colburn and Campbell then decided to post the RAL position externally.  (Campbell Dep. 19:12-17; Colburn Dep. 27:15-23; SUF ¶ 18; Resp. to SUF ¶ 18.)  When a position is posted externally, Syngenta employees are still permitted to apply internally for the position.  (White Dep. 55:9-21; SUF ¶ 18; Resp. to SUF ¶ 18.)  Booker did not reapply for the RAL position.  (Booker Dep. 143:22-144:17; SUF ¶ 18; Resp. to SUF ¶ 18.)  Syngenta ultimately selected Adam Hensley, an internal candidate who had a Master's of Business Administration and who had worked as a Sales Representative in

the Northern Field Crops Territory and as a Customer Campaign
Lead in the Coastal Commercial Unit. (Campbell Decl. ¶ 3;
Colburn Decl. ¶ 3; SUF ¶ 20; Resp. to SUF ¶ 20.)

### 2. District Manager ("DM") Position

Also on October 4, 2013, Booker's District Manager Bruce
Zurface announced his plan to retire as District Manager.
(Booker Dep. Ex. 10, ECF No. 28-5 at PageID 197; SUF ¶ 22; Resp.
to SUF ¶ 22.) Booker applied for the District Manager ("DM")
position that day. (Booker Dep. 143:25-144:6; SUF ¶ 22; Resp.
to SUF ¶ 22.) Out of six or seven applicants, four were
selected for in-person interviews, including Booker. (Boden
Dep. 20:24-22:9, ECF No. 28-9; SUF ¶ 23; Resp. to SUF ¶ 23.)
Boden, Jeff Taber, the Head of Field Force Excellence and
Training, and Courtney White, an African-American Business
Partner in Human Resources conducted the in-person interviews on
November 11, 2013. (Boden Dep. 22:15-17; Booker Dep. Ex. 10,
ECF No. 28-5 at PageID 199-200; SUF ¶ 24; Resp. to SUF ¶ 24.)
They selected Greg Dickinson for the DM position. (White Dep.
76:12-18; Boden Decl. ¶ 5; SUF ¶ 25; Resp. to SUF ¶ 25.) Booker
alleges that he was "initially told that the reason he was not
selected was due to a lack of leadership and that he needed to
take the classes DNA and Purposeful Coaching." (Resp. to SUF
¶ 25; see also Booker Decl. ¶ 22; SUF ¶ 27; Resp. to SUF ¶ 27.)
Booker had already taken these leadership classes and had

multiple recognitions for his leadership. (Zurface Dep. 30:8-24, ECF No. 31-10; ECF Nos. 31-16, 31-17, 31-18.) Boden, Taber, and White assert that they offered the position to Dickinson because he had broad and varied work experience, which included people management, and had "one of the best interviews" Taber could recall. (Taber Dep. 18:23-19:16, ECF No. 28-12; SUF ¶ 25; Resp. to SUF ¶ 25.) Comparatively, Boden, Taber, and White assert that they found "Booker's experience was narrower in scope, as it was confined to two roles in the same geographic region for his entire tenure with Syngenta and did not involve any experience managing other employees." (SUF ¶ 26 (citing White Dep. 76; Boden Decl. ¶ 6; Taber Decl. ¶ 3).) After Booker was informed that he was not selected for the DM position, he met with Boden to discuss the decision. (Boden Dep. 27:15-28:22; SUF ¶ 27; Resp. to SUF ¶ 27.) During this conversation, Boden encouraged Booker to continue exploring promotional opportunities with Syngenta outside of the Southern CU. (Boden Decl. ¶ 8; Booker Dep. 203:13-16, 204:15-20; SUF ¶ 31; Resp. to SUF ¶ 31.)

### 3. Resignation

On December 30, 2013, Booker tendered his resignation and Syngenta accepted his resignation that day, which was his last day of employment. (Booker Dep. 68-69, 72; White Decl. ¶ 5; SUF ¶ 32; Resp. to SUF ¶ 32.) Booker believed that he was denied

the RAL and DM positions because of his race, largely based on the fact that there was a lack of African-Americans in leadership positions. (Booker Dep. 233:7-20, ECF No. 31-2.) According to Booker, he resigned because he realized that he had "plateaued," due to "an unwritten rule" in Syngenta. (Booker Dep. 254:7-16.) Hensley and Dickinson did not start in the RAL and DM positions, respectively until January 1, 2014. (White Decl. ¶ 6; SUF ¶ 32; Resp. to SUF ¶ 32.) Booker began new employment with Bayer as a Technical Sales Specialist on January 6, 2014. (SUF ¶ 32; Resp. to SUF ¶ 32.)

**B. Procedural Background**

On August 4, 2014, Plaintiff filed a Complaint against Defendant. (ECF No. 1.) On September 17, 2014, Defendant filed an Answer. (ECF No. 15.)

Defendant filed its Motion for Summary Judgment on July 22, 2015. (ECF No. 28.) Plaintiff filed a Response in Opposition on August 19, 2015. (ECF No. 31.) Defendant filed a reply brief on August 31, 2015 (ECF No. 32), and a supplemental reply on September 8, 2015 (ECF No. 34).

The Court held a hearing on the motion for summary judgment on September 1, 2015. (Minute Entry, ECF No. 33.)

## II. <u>LEGAL STANDARD</u>

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of
summary judgment if proof of that fact would establish or refute
an essential element of the cause of action or defense."
Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir.
2012).

"In considering a motion for summary judgment, [the] court
construes all reasonable inferences in favor of the nonmoving
party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014)
(citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986)). "The moving party bears the initial
burden of demonstrating the absence of any genuine issue of
material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th
Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986)).

"Once the moving party satisfies its initial burden, the
burden shifts to the nonmoving party to set forth specific facts
showing a triable issue of material fact." Mosholder, 679 F.3d
at 448-49 (citing Matsushita, 475 U.S. at 587; Fed. R. Civ.
P. 56(e)). "'When the non-moving party fails to make a
sufficient showing of an essential element of his case on which
he bears the burden of proof, the moving parties are entitled to
judgment as a matter of law and summary judgment is proper.'"
Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d

911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670

F.3d 677, 680 (6th Cir. 2012) (en banc)); see also Kalich v.

AT&T Mobility, LLC, 679 F.3d 464, 469 (6th Cir. 2012).

"To show that a fact is, or is not, genuinely disputed,

both parties are required to either 'cite[] to particular parts

of materials in the record' or 'show[] that the materials cited

do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to

support the fact.'" Bruederle, 687 F.3d at 776 (alterations in

original) (quoting Fed. R. Civ. P. 56(c)(1)); see also

Mosholder, 679 F.3d at 448 ("To support its motion, the moving

party may show 'that there is an absence of evidence to support

the nonmoving party's case.'") (quoting Celotex Corp., 477 U.S.

at 325).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge[.]" Martinez,

703 F.3d at 914 (alteration in original) (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)) (internal

quotation marks omitted).

"The court need consider only the cited materials, but it

may consider other materials in the record." Fed. R. Civ.

P. 56(c)(3).  "[T]he district court has no 'duty to search the

entire record to establish that it is bereft of a genuine issue

of material fact.'" Pharos Capital Partners, L.P. v. Deloitte &

Touche, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam)
(quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir.
2008)).  "'[J]udges are not like pigs, hunting for truffles'
that might be buried in the record."  Emerson v. Novartis Pharm.
Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (alteration in
original) (quoting United States v. Dunkel, 927 F.2d 955, 956
(7th Cir. 1991)).

The decisive "question is whether 'the evidence presents a
sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a
matter of law.'"  Johnson v. Memphis Light Gas & Water Div., 777
F.3d 838, 843 (6th Cir. 2015) (quoting Anderson, 477 U.S. at
251–52).  "[A] mere 'scintilla' of evidence in support of the
non-moving party's position is insufficient to defeat summary
judgment; rather, the non-moving party must present evidence
upon which a reasonable jury could find in her favor."  Tingle
v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012)
(quoting Anderson, 477 U.S. at 251).

## III. ANALYSIS

Defendant argues that it is entitled to summary judgment
for three reasons: first, Defendant argues that Plaintiff fails
to establish a claim for employment discrimination (ECF No. 28-1
at 3-12); second, Defendant argues that the constructive
discharge claim is foreclosed because it is based solely on the

failure to promote (id. at 13-14); and third, Defendant argues that Plaintiff cannot recover back pay, front pay, or punitive damages because he voluntarily resigned before the date the promotions took place, there is no evidence of malice or reckless indifference, and Defendant made a good-faith effort to comply with Title VII (id. at 14-15).  The Court addresses each claim in turn.

### A.    Employment Discrimination

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) another employee of similar qualifications who is not a member of the protected class received the promotion.  Sigall-Krakulich v. City of Columbus, 156 F. App'x 791, 796 (6th Cir. 2005); see also White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008) (describing the general requirements of establishing a prima facie case under Title VII).  "The prima facie burden is not intended to be onerous," and the plaintiff is not required to show that he and the person ultimately promoted had the exact same qualifications.  Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 814 (6th Cir. 2011).

"Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." White, 533 F.3d at 391. "Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." Id. at 391–92.

To establish pretext, the plaintiff must demonstrate that the proffered reasons: (1) had no basis in fact; (2) were not the actual reasons; or (3) were insufficient to explain the employer's actions. Sigall-Drakulich, 156 F. App'x at 797. "Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates." Gee-Thomas v. Cingular Wireless, 324 F. Supp. 2d 875, 887 (M.D. Tenn. 2004) (quoting Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987). Moreover, "a[n] employer has even greater flexibility in choosing a management-level employee . . . because of the nature of such a position." Id. A "[p]laintiff cannot demonstrate pretext merely by showing that Defendant's hiring rationale was 'mistaken, foolish, trivial, or baseless,' so long as Defendant honestly believed in the rationale and based this belief on particularized facts before it at the time." Sigall-Drakulich, 156 F. App'x at 797 (quoting Smith v. Chrysler Corp., 155 F.3d

799, 806 (6th Cir. 1998)).  The Sixth Circuit has recognized, however, that "evidence of pretext may consist of a defendant's changing explanations." Cichewicz v. UNOVA Indus. Auto. Sys., Inc., 92 F. App'x 215, 220-21 (6th Cir. 2004) (finding that evidence of the defendant's shifting explanations was sufficient for the plaintiff to survive summary judgment).

Defendant argues that it is entitled to summary judgment on Plaintiff's employment discrimination claim for four reasons: (1) "[w]ith respect to the RAL promotion, Booker cannot establish the fourth prong of the prima facie case because he did not possess qualifications similar to those of Killebrew or Hensley" (ECF No. 28-1 at 4-6); (2) with respect to the DM position, "Booker likewise lacked qualifications similar to Greg Dickinson" (id. at 6-7); (3) Plaintiff cannot prove that Defendant's legitimate non-discriminatory reason for its RAL promotional decision was pretextual (id. at 8-11); and (4) Plaintiff cannot prove that Defendant's legitimate non-discriminatory reason for its DM promotional decision was pretextual (id. at 11-12).  The Court addresses Defendant's first two arguments in turn, and then addresses Defendant's third and fourth arguments together.

### 1. Prima Facie Case for Regional Account Lead Position

According to Defendant, Plaintiff cannot sustain his burden to establish a prima facie case for employment discrimination because no similarly qualified employee was selected for a promotion to the RAL position over him. (See id. at 4-6.)

The Court is unpersuaded by this argument. While Plaintiff has not shown that he was similarly qualified to Killebrew, he has shown that he was similarly qualified to Hensley.

The undisputed facts show that Plaintiff and Killebrew did not possess similar qualifications. The RAL position involves working with a single customer, namely CPS. (Colburn Dep. 8:3-12, ECF No. 28-6; Booker Dep. 113:8-10; SUF ¶ 8; Resp. to SUF ¶ 8.) Killebrew had worked for CPS for six years before coming to Syngenta and had strong recommendations from CPS management. (ECF No. 28-7 at PageID 284-85; Colburn Dep. 23:11-24:9, 24:23-25:16.) Although Plaintiff worked with CPS in his roles in Syngenta, his experience is not comparable. (See Booker Dep. 112-13.) There is no evidence that Plaintiff had knowledge of CPS's internal organization structure and strategies or that he had strong recommendations from the CPS manager with whom the RAL would be working. Killebrew's past experience with CPS made him uniquely qualified for the position, and Plaintiff could not be considered similarly situated.

On the other hand, viewing the evidence in the light most favorable to Plaintiff, he was at least as qualified as Hensley.[1] Hensley graduated college in 2007 and earned an Executive Masters of Business Administration ("Executive MBA") in 2011. (Campbell Dep. Ex. 15, ECF No. 28-7 at PageID 277; Campbell Decl. ¶ 3; Colburn Decl. ¶ 3)  In total, Hensley had six years of work experience at Sygenta, which included experience as a Sales Representative in Syngenta's Northern Field Crops Territory and as a Customer Campaign Lead in Syngenta's Coastal CU.  (Campbell Dep. Ex. 15, ECF No. 28-7 at PageID 277; Campbell Decl. ¶ 3; Colburn Decl. ¶ 3.)

By contrast, Plaintiff lacked a graduate degree, but had approximately twenty years of work experience in the field. (Booker Resume, ECF No. 31-4.)  Moreover, there is evidence that Plaintiff worked with CPS in his role as Sales Representative

---

[1] Defendant argues that Hensley should not be used as a comparator because Plaintiff did not re-apply for the RAL position after it was opened up to external candidates, and therefore did not directly compete with Hensley for the position. (ECF No. 28-1 at 4 n.2.)  It is uncontroverted that Plaintiff had already been told that he would not be selected for the position and that the RAL position might not be filled at all.  (Booker Dep. 127, ECF No. 31-2.)  In the instant matter, Plaintiff did not merely express a general interest to be considered, (see Williams v. Hevi-Duty Elec. Co., 819 F.2d 620 (6th Cir. 1987)), but rather, had specifically applied to the position in question just weeks earlier.  Moreover, Mr. Colburn and Mr. Campbell both testified that they could have considered Mr. Booker for the RAL position after Mr. Killebrew turned down the offer.  (See Colburn Dep. 27:7-11; Campbell Dep. 21:5-11.)  Accordingly, the Court finds that Plaintiff reasonably believed re-application to be futile and did not need to re-apply to the RAL position. See Wanger v. G.A. Gray Co., 872 F.2d 142, 145 (6th Cir. 1989) (quoting Babrocky v. Jewel Food Co., 773 F.2d 857, 867 (7th Cir. 1985)) ("Because an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless, even nonapplicants can in appropriate circumstances qualify for relief . . . .").

and RPR, but no evidence that Hensley had any experience working with CPS. Although Hensley and Plaintiff may have had different strengths and weaknesses, viewing the evidence in the light most favorable to Plaintiff, Plaintiff's depth of experience made him similarly qualified to Hensley.

Accordingly, Plaintiff has established a prima facie case for the RAL position sufficient to avoid summary judgment on this issue.

### 2. Prima Facie Case for District Manager Position

Defendant argues that Plaintiff was not similarly qualified to Dickinson for the DM position because Plaintiff lacked prior management experience. (ECF No. 28-1 at 6-7.)

The Court finds this argument unpersuasive. The undisputed facts reflect that Dickinson started as a Sales Representative in the South Delta District in 2002, transitioned to an AgriEdge Specialist in the Southwest District in 2007, and was promoted to an AgriEdge Manager in the Horticulture Business Unit in 2009. (White Decl. ¶ 4; SUF ¶ 25; Resp. to SUF ¶ 25.) In these roles, Dickinson worked in the Southern CU and the Coastal CU, as well as in the east coast region. (White Decl. ¶ 4; SUF ¶ 25; Resp. to SUF ¶ 25.)

By contrast, Plaintiff had significant experience in the Mid-South region, where the DM position was located. (See Booker Decl. ¶¶ 29-35.) He had started as a Sales

Representative in 1997 and was promoted to RBR in 2011. (See Booker Resume; Booker Dep. 32:10-15, ECF No. 31-2; Zurface Dep. 30:2-7.)) In that capacity, he worked closely with the District Manager and managed some business accounts for customers in the district. (Booker Dep. 51:12-23) Although he did not have formal managerial responsibilities, he supervised interns and Developmental Sales Representatives. (Booker Dep. 106-108; Booker Dec. ¶¶ 29-30.)

Again, although Dickinson and Plaintiff offered varying strengths and weaknesses, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has satisfied the modest burden of establishing a prima facie case.

### 3. Pretext for Regional Account Lead and District Manager Positions

The question of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 79 (2d Cir. 2001). "[U]nless the defendants' proffered nondiscriminatory reason is dispositive and forecloses any issue of material fact, summary judgment is inappropriate." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 124 (2d Cir. 2004) (internal quotation marks omitted). Although Defendant points to evidence in the record that supports its contention that its decision not to promote Plaintiff was for a

non-discriminatory reason, Plaintiff maintains that Defendant's shifting explanations for its decisions not to promote him indicate pretext. (See ECF No. 31 at 12-15.)

Specifically, Plaintiff points to the fact that, with respect to the decision not to promote him to the RAL position, Mr. Colburn initially informed Plaintiff that he was not selected because Plaintiff lacked "District Manager-type experience." (Colburn Dep. 43:7-12.) Plaintiff notes that during litigation, however, Defendant has asserted "that Mr. Killebrew was selected because of his experience with CPS, the recommendation of CPS' management team, and his diverse business experience in the seed business" and that "[t]he selection of Mr. Hensley casts further doubt on these reasons." (ECF No. 31 at 12.) With respect to the decision not to promote him to the DM position, Plaintiff points to the fact that he was initially told that he lacked leadership experience and that Defendant has since emphasized Mr. Dickinson's "opportunity to observe" Syngenta's business operations in the Southern and Coastal CU's as a reason for Mr. Dickinson's selection. (Id. at 14.)

Evidence of an employer's shifting explanations for its employment decisions is sufficient to demonstrate pretext for the purpose of summary judgment. See Cichewicz, 92 F. App'x at 220-21. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the evidence in the record is sufficient

for a reasonable jury to find that the asserted rationale for the failures to promote Plaintiff were pretextual.  Summary judgment on these claims would therefore be inappropriate.

### B.  Constructive Discharge

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit[,] and the employee must actually quit."  Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999).  When analyzing working conditions, relevant factors include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001) (quoting Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)).

The Sixth Circuit has further held that "a plaintiff cannot establish a constructive discharge by claiming, without more, that his employer's 'failure to promote [him] to what [he] perceives as [his] rightful position created intolerable work conditions.  If [the court] were to accept this line of reasoning, every person passed over for a purportedly deserved

promotion could bring an illegal discharge suit, and the
distinction between the two would be erased.'" Gold v. FedEx
Freight E., Inc., 487 F.3d 1001, 1011 (6th Cir. 2007) (quoting
Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir. 1996)).

Defendant argues that it is entitled to summary judgment on
Plaintiff's constructive discharge claim because "[t]he Sixth
Circuit does not recognize a constructive discharge claim based
on failure to promote. (ECF No. 28-1 at 13.)

Plaintiff argues that he was subject to "intolerable
working conditions" because he would be required to work with
and train the individual selected over him for the DM position.
(ECF No. 31 at 15-16.) Plaintiff further argues that the "false
reasons for denying him the promotions" given by Defendant
evince an intolerable working environment. (Id. at 16.)
Plaintiff asserts that these circumstances, together with the
lack of African-American DM's, RAL's, or RBR's in the Southern
CU, eliminated any opportunity for advancement and constituted
constructive discharge. (Id. at 15-16.)

The Court finds that Plaintiff has failed to present
sufficient evidence of constructive discharge. Plaintiff
asserts that it would be "intolerable" to train the individual
selected for the DM position over him. This responsibility,
however, was simply a result of circumstance. Because the RBR
reported to the DM, Plaintiff would have to report to whomever

held the DM position.  Moreover, Plaintiff was informed that he would need to support Dickinson in this role because Dickinson had previously worked in another district of Syngenta.  Even if Plaintiff had not applied for the DM position, he still would have had to support a new DM who entered from another district. This condition was not deliberately created by Syngenta with the intention of forcing Plaintiff to quit.  It was simply a consequence of Syngenta's decision to select Dickinson for the DM position.

Furthermore, Plaintiff's argument that Defendant created intolerable working conditions by giving him false reasons for denying him the promotions is strictly related to his failure to promote claim.  Plaintiff's argument regarding Defendant's "shifting explanations" relates to the differences in Defendant's articulated explanations at the time of each decision and at the time of litigation.  At the time that Plaintiff resigned from Syngenta, however, Plaintiff had been informed that (1) he was not selected for the RAL position because he lacked District Manager-type experience (Booker Decl. ¶ 14) and (2) he was not selected for the DM position based on leadership (id. ¶ 22).  There is no evidence indicating that Plaintiff perceived these reasons to be false at the time of his

resignation.[2] Accordingly, Plaintiff's argument that Defendant's allegedly false reasons for denying him the promotions created intolerable working conditions is meritless.

Finally, Plaintiff fails to present sufficient evidence to support his argument that the lack of African-Americans in leadership at Syngenta created intolerable working conditions and forced him to resign. Although Plaintiff has submitted proof that there was only one management personnel within the sales organization who was African-American (Booker Dep. 125:7-15; White Dep. 77:22-78:1), he has not submitted any evidence regarding the number of African-American applicants for these positions, or even the total number of African-American employees at Syngenta and specifically in the Southern CU. Additionally, Plaintiff has conceded that he did not experience racial harassment during his employment with Syngenta. (SUF ¶ 33; Resp. to SUF ¶ 33.) Moreover, there is no evidence that these conditions were "deliberately created" with the purpose of forcing Plaintiff to resign.

Accordingly, there is insufficient evidence for a reasonable jury to find that Syngenta deliberately created intolerable working conditions, as perceived by a reasonable

---

[2] Plaintiff asserts that Mr. Boden informed Plaintiff that he needed to take specific courses, which Plaintiff had already taken. At that same meeting, however, Mr. Boden retracted his statement regarding the specific courses and reasserted that the decision was based "around leadership." (Boden Dep. 27:22-28:22.)

person, with the intention of forcing Plaintiff to quit.

Despite Plaintiff's assertions, the record reflects that he was

not subject to "intolerable working conditions" deliberately

created by Defendant.

Even viewing the facts in the light most favorable to

Plaintiff, Plaintiff cannot establish that he was constructively

discharged, and Defendant is entitled to summary judgment on

this claim.

### C. Back Pay, Front Pay, and Punitive Damages

Defendant argues that it is entitled to summary judgment on

Plaintiff's back pay and front pay claims because "an employee

cannot recover back pay or front pay after voluntarily resigning

[his] employment."  (ECF No. 28-1 at 14 (citing Lulaj v.

Wackenhut Corp., 512 F.3d 760, 767 (6th Cir. 2008)).)  Defendant

further argues that it is entitled to summary judgment on

Plaintiff's punitive damages claim for two reasons: first,

because Plaintiff "concedes that he was not subject to

intolerable racial harassment and that none of the

decisionmakers at issue made any racist remarks" (id.); and

second, because Defendant "engaged in good-faith efforts to

comply with Title VII" (id.).

### 1. Back Pay and Front Pay

"To place the plaintiff in the position []he would have

occupied had the discrimination not taken place, a successful

plaintiff in an employment discrimination case is generally entitled to an award of back pay from the date of discharge through the date of judgment." Gaddy v. Radio Sys. Corp., 59 F. Supp. 3d 857, 861 (E.D. Tenn. 2014). "[I]n order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee." Lulaj, 512 F.3d at 767 (alteration in original) (quoting Jurgens v. EEOC, 903 F.2d 386, 389 (5th Cir. 1990)) (upholding the district court's reduction of the back pay award to "the difference in pay between the two positions over the period between [plaintiff's] denied promotion and her voluntary departure").

Where reinstatement is not appropriate, Title VII provides for front pay. See Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 850 (2001). "Front pay is . . . simply compensation for the post-judgment effects of past discrimination." Shore v. Fed. Express Corp., 777 F.2d 1155, 1158-59 (6th Cir. 1985). "In a promotion case, the period of liability will end if plaintiff voluntarily quits his employment with the defendant absent a constructive discharge." Lulaj, 512 F.3d at 767 (quoting EEOC v. Monarch Mach. Tool Co., 737 F.2d 1444, 1453 (6th Cir. 1980)).

Defendant argues that it is entitled to summary judgment on Plaintiff's back pay and front pay claims because "Booker's

resignation precludes any award of front or pay back after December 30, 2013." (ECF No. 28-1 at 14.) Defendant asserts that "Hensley and Dickinson did not start in the RAL and District Manager positions, respectively, until January 1, 2014, two days after Booker's resignation . . . ." (Id.)

The Court agrees with Defendant. The law is well-established that a plaintiff who voluntarily resigns is not entitled to back pay or front pay beyond the date of his resignation. See Lulaj, 512 F.3d at 767. It is undisputed that Plaintiff's last day of employment was December 30, 2013, and Dickinson and Hensley started their new positions after January 1, 2014. (SUF ¶ 32; Resp. to SUF ¶ 32.) Under these facts, no reasonable jury could find that Plaintiff is entitled to back pay or front pay. As discussed above, Plaintiff's constructive discharge claim fails as a matter of law. Accordingly, the law precludes an award of back pay or front pay after the date of his resignation. Because Plaintiff would only be entitled to back pay or front pay beginning on the date that the promotions took effect, and that date is after the date of his resignation, he cannot recover back pay or front pay.

Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's back pay and front pay claims.

## 2. Punitive Damages

Punitive damages are available under Title IV if the plaintiff can "demonstrate[] that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999).

The employer may also avoid punitive damages by demonstrating that it made good faith efforts to comply with anti-discrimination laws. Id. at 544-45. This defense "accomplishes Title VII's objective of motivating employers to detect and deter Title VII violations." Id. at 545-46 (internal quotation marks and brackets omitted). "With this in mind, courts interpreting this criteria since Kolstad have focused both on whether the defendant employer had a written [] harassment policy and whether the employer effectively publicized and enforced its policy." West v. Tyson Foods, Inc., 374 F. App'x 624, 638 (6th Cir. 2010) (quoting Parker v. Gen. Extrusions, Inc., 491 F.3d 596, 602-03 (6th Cir. 2007)).

Defendant argues that "Booker has made no allegations that would entitle him to punitive damages." (ECF No. 28-1 at 14.)

26

Defendant therefore argues that it is entitled to summary judgment for two reasons: first, Defendant argues that Plaintiff has not established that Defendant engaged in discriminatory practices with malice or with reckless indifference to his rights (id.); and, second, Defendant argues that it "is fully committed to the principles of equal opportunity employment" and is entitled to "the good-faith defense enunciated in Kolstad" (id. at 15).

The Court finds Defendant's arguments persuasive. With respect to Defendant's first argument -- that Plaintiff can point to no evidence that Defendant acted maliciously or with reckless indifference in making the promotional decisions -- the Court agrees. Plaintiff concedes that he did not hear any racist remarks made by any of the decisionmakers in this case. (Resp. to SUF ¶ 33.) He further concedes that he was not subjected to racial harassment. (Id.) Although Plaintiff argues that he was subjected to racism generally, he puts forth no evidence to support this contention. Instead, the record reflects that Mr. Colburn and Mr. Boden encouraged Plaintiff to apply for the RAL position (Booker Dep. 130:25-131:3, 131:22-24, 134:9-11; SUF ¶¶ 10, 11; Resp. to SUF ¶¶ 10, 11), and that Mr. Boden encouraged Plaintiff to apply for other promotional opportunities in other areas of the company at their meeting on November 15, 2013. (Booker Dep. 203:13-16, 204:15-20; SUF ¶ 31;

Resp. to SUF ¶ 31.)  There is no evidence that Defendant acted maliciously or with reckless indifference to Plaintiff's rights in making employment decisions; rather, the evidence indicates that Defendant valued Plaintiff as an employee and encouraged him to look for other promotional opportunities going forward.

The Court also agrees with Defendant's argument that it is entitled to <u>Kolstad</u>'s good-faith defense.  It is undisputed that Defendant maintained an Equal Opportunity policy, which strictly prohibits discrimination on the basis of any protected category, including race.  (White Decl. ¶ 3; Booker Dep. 209:14-210:6; Booker Dep. Ex. 19, ECF No. 28-5 at PageID 211; SUF ¶ 2; Resp. to SUF ¶ 2.)  It is further undisputed that Defendant trains its employees regarding its anti-discrimination policy, that Defendant makes the policy available to new employees through the company intranet, and that Plaintiff received a copy of the policy and had knowledge of its contents.  (White Decl. ¶ 3; SUF ¶ 2; Resp. to SUF ¶ 2.)  There is therefore no genuine dispute of fact that Defendant engaged in good-faith efforts to comply with Title VII.  Accordingly, Defendant is entitled to summary judgment on this claim.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 28) is GRANTED IN PART as to the constructive

discharge, front pay, back pay, and punitive damages claims and DENIED IN PART as to the failure to promote claims.

**IT IS SO ORDERED,** this 8th day of October, 2015.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE